## In re Water Rights

ADAMS, Deputy Attorney General, August 5, 1940.—
We have your letter of May 15, 1940, in which you ask
five questions with regard to the administration of the
Act of June 24, 1939, P. L. 842, 32 PS §631, which act re-
lates to the acquisition of rights to divert water from

rivers, streams, natural lakes, and ponds, or other surface waters within the Commonwealth.

This act is the only presently effective authority for the acquisition of water rights as appears from section 5 of the act, which reads as follows:

"Section 5. No public water supply agency shall hereafter acquire any water rights except as provided in this act, and any acquisition of water rights hereafter, except as provided in this act, shall be deemed to be unlawful null and void"; with the exception of water rights heretofore or hereafter acquired under the Act of June 14, 1923, P. L. 704, 32 PS §591, which refers to water power and water supply permits.

Your first question is:

1. Do wells, drilled or artesian, and springs come within the terms of the above act? [Act of 1939, supra.]

Section 1(e) of the Act of 1939, supra, defines "water rights" as follows:

"(e) 'Water rights' shall mean the right to take or divert water from any rivers, streams, natural lakes and ponds, or other surface waters within or partly within and partly without the Commonwealth of Pennsylvania, except water rights heretofore or hereafter acquired under the Act of June 14, 1923, Pamphlet Laws 704."

Wells and springs not being specifically included in the definition of the term "water rights", the question arises whether wells and springs are included within the term "surface waters".

Surface waters are defined in 67 C. J. 862, §286, as "those which fall on the land from the skies or arise in springs, and diffuse themselves over the surface of the ground following no defined course or channel, and not gathering into or forming any more definite body of water than a mere bog or marsh, and are lost by being diffused over the ground through percolation, evaporation, or natural drainage."

The same authority also states that surface water is a term which has been defined or used variously, and that

a few of the definitions impose statements which would imply that it is a term appropriate to be applied to all fresh water upon the surface of the earth, not ponded, which is not that of a water course. Other definitions given are that, in its ordinary sense, it means water collected on the surface of the ground. Inasmuch as the term "or other surface waters" is used in the alternative sense with rivers, streams, natural lakes and ponds, we are of the opinion that the term "surface waters" is used in the sense of meaning waters collected on the surface of the ground.

The phrase "artesian well" is defined in 5 C. J. 590 as a perforation or boring into the ground, deep enough to reach a subterranean body of water of which the sources are higher than the place where the perforation is made, and so force up to the surface a constant stream of water.

A "well" is defined in 68 C. J. 168 as a hole sunk or drilled into the earth to such a depth as to reach a supply of water.

In view of these definitions, we are of the opinion that artesian wells or drilled wells do not come within the definition of "surface waters", as that term is used in the Act of 1939, supra.

Turning to the question of whether "springs" are within the definition of "surface waters", we find "a spring" is defined in 58 C. J. 1307 to mean "A fountain of water; a place where water by natural forces issues from the ground; a place where water comes naturally to the surface of the ground and flows away . . . *The term is said to be correctly used to denote the natural source of water supply.*" (Italics supplied.)

However, we do not consider that springs are, in all cases, excluded from the terms of the above act, but are of the opinion that they are within the terms of the act where a stream is created by a spring, which stream flows in a natural channel, and without the act where a spring

is diffused over the ground and follows no defined course or channel.

In 67 C. J. 675, §2, it is said:

*"In the absence of statutory regulations or private agreements, all waters are, in contemplation of law, regarded as either flowing or percolating.* The former consists of those bodies, such as lakes or ponds, and streams, which are upon or beneath the surface of the earth, and whose boundaries and courses are well defined and reasonably ascertainable, and whose existence is not of a temporary or ephemeral character. All other waters are percolating waters." (Italics supplied.)

In 67 C. J. 836, §252, it is said:

"The general rule vesting the ownership of percolating waters in the owner of the land has been held not to apply to the waters of an artesian basin underlying the lands of several owners. . . ".

In 67 C. J. 836, §251, it is said:

"A spring which does not constitute the source of a watercourse, the flow of its waste or surplus being subterranean and concealed and a matter of uncertainty as to direction and volume, belongs to the owner of the land, who may appropriate and use its entire flow, subject to contract or easement rights that may exist in others, even where the waste spreads over the surface for some distance and onto the land of the adjoining owner before going underground."

In the case of Brown v. Kistler et al., 190 Pa. 499 (1889), it was said by the lower court, on page 500:

"It is the law that water that is in the earth and finds its way through the soil by percolating or seeping, and has not a defined flow in a stream either underground or above the ground is absolutely the property of the man who owns the land in which that water is found; he has the same right to it as he has to anything else in the ground. But where there is a defined stream, whether on or below the surface, a flow of water that is visible, a

channel as it has been called in this case, a gutter in which it flows, and it passes through the lands of one to the lands of another below him, there the rule is different . . .".

In 67 C. J. 834, 835, §250, it is said:

"In the absence of express contract or *positive legislation* pertinent and contrary thereto, percolating water existing in the earth is regarded as a part of the soil in which the person owning the land has a property right . . ." (Italics supplied.)

We call attention to section 9 of the Act of 1939, supra, which reads as follows:

"Section 9. All public water supply agencies heretofore or hereafter incorporated under the laws of the Commonwealth of Pennsylvania and holding a permit issued by the board under the provisions of this act, shall have the power and may exercise the right of eminent domain as respects the appropriation of the water and the water rights authorized by said permit and land covered by said waters: Provided, however, That such right shall not apply to *private spring and private water supplies.*"

We are, therefore, of the opinion that springs may or may not come within the terms of the act, depending upon whether or not they are flowing waters or percolating waters; it being understood that the term "percolating waters" includes all waters that pass through the ground beneath the surface of the earth, without a definite channel and not shown to be supplied by a definite flowing stream.

Your second question is:

2. Are industrial concerns, which incidentally supply water in the community in which they are located under a certificate of public convenience, affected by this act?

Section 1 of the Public Utility Law, 66 PS §1101, reads in part as follows:

"(17) 'Public Utility' means persons or corporations now or hereafter owning or operating in this Commonwealth equipment, or facilities for . . .

"(b). Diverting, developing, pumping, impounding, distributing, or furnishing water to or for the public for compensation . . ."

A certificate of public convenience granted under the circumstances set forth in your second question is evidence of the fact that the industrial concern is a public utility, within the meaning of the Public Utility Law. In the event the industrial concern is a corporation, it then falls within the definition of a "public water supply agency", which is defined in section 1(b) of the Act of 1939, as follows:

"(b) 'Public water supply agency' shall mean *any corporation* . . . now existing or hereafter incorporated under the laws of the Commonwealth of Pennsylvania and vested with the power, authority, right, or franchise to supply water to the public in all or part of any municipal or political subdivision of the Commonwealth of Pennsylvania."

The answer to your second question, therefore, is that industrial concerns which are corporations fall within the terms of the Act of 1939.

Your third and fourth questions read:

3. Should water companies, purchasing their supply of water from other water companies or municipalities, file a statement pursuant to section 3 of the act?

4. Should water companies file a statement pursuant to section 3 of the act when their supply is purchased from an industrial concern?

Those two questions are answered together, in view of the similarity. Assuming that water companies, mentioned in your questions, come within the meaning of a "public water supply agency", as hereinbefore defined, no exemption appears in the act which would eliminate them from the duty of filing a statement as required in section 3 of the Act of June 24, 1939, supra. On the contrary, it would appear to be the intent of the legislature to bring such companies within the terms of the act in order to ascertain whether they are exercising rights

granted in their charters, and whether the acquisition of water rights has been followed by an actual taking, as set out in section 2 of the act.

Attention is called to the following clause in the preamble of the Act of 1939, supra, which reads:

"Whereas, The public interest requires that sources of water supply appropriated or acquired but not used or not reasonably necessary for future needs should be available for appropriation or acquisition by others requiring such sources".

Water companies which have acquired rights and are not exercising them, as your questions assume, should file a statement in order that the Water and Power Resources Board may possess this information.

Your fifth question reads:

5. Should individuals file statements under section 3 of the act, when such individuals serve water to the public under a certificate of public convenience?

Individuals do not fall within the definition of a "public water supply agency", as hereinbefore set forth. Therefore, individuals do not come within the terms of the act.

Your final question, unnumbered, which we shall designate no. 6, refers to permits granted by the board pursuant to sections 4, 5, 6, and 7 of the Act of April 8, 1937, P. L. 258, 32 PS §§603-609, which was repealed by the Act of 1939, supra. Your question asks whether or not these permits have been voided by the 1939 act. Section 2 of the Act of 1939 reads as follows:

"Section 2. Any acquisition of water rights heretofore acquired by any public water supply agency, which acquisition has not been followed by an actual taking from the source acquired either heretofore or within a period of one year after the effective date of this act, is hereby declared null and void and of no effect to the extent required to make water rights from such source available for acquisition under the terms of this act."

Therefore, permits heretofore acquired are null and void which have not been followed by an actual taking,

within a period of one year from the effective date of the act, i. e., June 24, 1939.

As to the permits which were issued, and which permits were followed by an actual taking of the water from the source acquired, such public water supply agency should have, within one year after the effective date of the act, i. e., June 24, 1939, produced to the Water and Power Resources Board the information set forth in section 3 of the Act of 1939, supra, which reads as follows:

*"Section 3. No acquisition of water rights from a source of supply by any public water supply agency shall be effective to prevent the acquisition of water rights from such source of supply in the future* under the terms of this act, unless, within one year after the effective date of this act, the public water supply agency shall have produced to the board the record upon which such acquisition is founded or a statement of the facts relied upon to show that such acquisition has been lawfully accomplished, and shall have filed in the office of the board, duly certified and acknowledged, transcripts of corporate or other action or proceeding, or statement of facts or records relied upon as the basis of a claim of acquisition of water rights, and a sworn statement of an estimate of the amount of water reasonably necessary from said source of water supply for present purposes and future needs, and also such other or additional information as the board may deem necessary: Provided, That prior compliance with the provisions of the Act of 1937, Pamphlet Laws 258, number 64, by any public water supply agency shall be deemed to be a full meeting of the requirements of this section of this act." (Italics supplied.)

The rights under the permits have been lost if these requirements were not fulfilled within one year from June 24, 1939.

Going a step further, and assuming that the requirements of sections 2 and 3, supra, have been complied with, we are of the opinion that the answer to your question is found in 37 C. J. 214, §68, which reads as follows:

"Section 68. Effect of Repeal. As in the case of statutes generally, the repeal of a statute or ordinance, without a saving clause as to existing rights, takes away all rights and remedies given by the repealed statute or ordinance and defeats all pending proceedings for its enforcement, and relieves a person against whom a license or occupation tax has accrued from liability for its payment. . . ."

"All the privileges permitted by the license, and all the protection given thereby, although yet unexpired, are generally cancelled and revoked by the repeal of the law which authorized its grant, *unless the license, although obtained under the repealed law, is such a license as is required by the new law.*" (Italics supplied.)

We are, therefore, of the opinion that those licenses or permits are, and will be, in full force and effect, which have been followed by an actual taking of the water, where the licensees have supplied, within one year from June 24, 1939, the information required in the Act of 1939.

To summarize, we are of the opinion, and you are accordingly advised, that:

1. Wells, whether drilled or artesian, do not come within the terms of the Act of June 24, 1939, P. L. 842.

Springs may or may not come within the terms of the Act of 1939, supra, depending upon whether or not they are flowing waters or percolating waters; the former coming within the act and the latter without the act.

2. Industrial concerns which are corporations come within the terms of the Act of 1939.

3. Water companies purchasing their supply of water from other water companies or municipalities must file a statement under the terms of the Act of 1939.

4. Water companies purchasing their supply of water from industrial concerns must file a statement, under the terms of the Act of 1939.

5. Individuals do not come within the terms of the Act of 1939.

6. (*a*) Permits are voided which were not followed by an actual taking within one year from June 24, 1939.

(*b*) In those cases where permits were followed by an actual taking of the water, a statement should have been filed within one year after June 24, 1939, in order to prevent the loss of such water rights from said source of supply.

(*c*) In those cases where permits have been followed by an actual taking, and a statement has been filed, no additional permit is needed, the permits granted under the Act of April 8, 1937, P. L. 258, being in full force and effect.